IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FS Algarrobo Limited | § | CIVIL ACTION _____ |
| FS Andes Limited | § | |
| FS Andino Limited | § | IN ADMIRALTY, Rule 9(h) |
| FS Arica Limited | § | |
| FS Austral Limited, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| Columbia Shipmanagement Ltd., | § | |
| | § | |
| Defendant, | § | |
| | § | |
| and | § | |
| | § | |
| Bacardi Corporation | § | |
| E D and F Man Liquid Products LLC | § | |
| ExxonMobil Oil Corporation | § | |
| Freepoint Commodities LLC | § | |
| Inchcape Shipping Services, Inc. | § | |
| Linblad Expeditions, LLC | § | |
| Marathon Petroleum Supply LLC | § | |
| Navig8 Product Tankers LLC | § | |
| Novum Energy Trading Inc. | § | |
| NYK Line (North America) Inc. | § | |
| Shell Trading Services Company | § | |
| Wilhelmsen Ship Management (USA) Inc. | § | |
| Wilhelmsen Ships Service, Inc. | § | |
| Trafigura Trading LLC | § | |
| UPT United Product Tankers (Americas) LLC | § | |
| Valero Marketing and Supply Company | § | |
| | § | |
| Garnishees. | § | |

**VERIFIED COMPLAINT WITH REQUEST FOR ISSUANCE OF
PROCESS OF MARITIME ATTACHMENT AND GARNISHMENT**

FS Algarrobo Limited, FS Andes Limited, FS Andino Limited, FS Arica Limited and

FS Austral Limited (collectively "Plaintiffs") bring this action against Columbia

Shipmanagement Ltd. ("CSM") *quasi in rem* pursuant to Supplemental Rule B for Certain

Admiralty and Maritime Claims, requesting the issue of writs of maritime attachment and

garnishment including against Garnishees and states as follows:

**Jurisdiction and Venue**

1.      This is an action within this Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and is an admiralty or maritime claim within Fed. R. Civ. P. 9(h).  Plaintiffs further bring this action in aid of and to secure a judgment which Plaintiffs will obtain against CSM in the The High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (the "London Litigation"), pursuant to the venue provisions of contracts at issue in those proceedings, and here between Plaintiffs and CSM.

2.      Venue is proper in this District because the Garnishees are, within the meaning of Supplemental Rule B located, can be found, and/or can be served with process in this District.

3.      Venue is also proper in this District because CSM's property is or soon will be in this District, namely, accounts payable from Garnishees to CSM.

4.      CSM cannot be found in this District within the meaning of Supplemental Rule B.

**The Parties**

5.      Plaintiffs each are corporations organized under the laws of the Republic of Liberia and own or owned ocean-going vessels ("Vessels") managed by CSM:

| | |
|---|---|
| FS Algarrobo Limited | M/V ALGOROBBO |
| FS Andes Limited | M/V ANDES |
| FS Andino Limited | M/V ANDINO |
| FS Arica Limited | M/V ARICA |
| FS Austral Limited | M/V AUSTRAL |

6.      CSM is a Cyprus corporation.  CSM, as detailed herein, breached its vessel management contracts with Plaintiffs and caused other damages to Plaintiffs.

7.      Garnishees each are entities with offices or agents located in this District which, on information and belief as detailed below, Plaintiffs reasonably believe holds accounts which are the property of and/or owing to CSM.

**Facts**

8.      CSM was at all material times the appointed ship manager for Plaintiffs'

Vessels pursuant to five Ship Management Agreements entered into between each of the

Plaintiffs and CSM on amended SHIPMAN 2009 forms dated 8 February 2019 (the

"SMAs"). The relevant background to the SMAs is this:

        a.      The original acquisition of each of the Vessels was subject to a loan

agreement entered into by Plaintiffs on or around 26 February 2016, and subsequently

amended and/or restated pursuant to an addendum no. 3 on or around 24 August 2017 (the

"Loan Agreement");

        b.      Pursuant to the Loan Agreement, Norddeutsche Landesbank

Girozentrale ("NLB") agreed to finance, in whole or in part, the acquisition of the Vessels in

exchange for preferred Liberian mortgages over them.

        c.      On or around 2 March 2020, NLB sold its participation in the Loan

Agreement as lender to Bank of America Merrill Lynch ("BAML"), although NLB remained

both a "Facility Agent" and "Security Agent" as defined therein.

        d.      Prior to the SMAs, and as of 31 December 2018, the Plaintiffs were in

breach of the terms of the Loan Agreement.In around April/May 2020, BAML held Plaintiffs

to be in default on the mortgages.

9.      Interunity Management (Deutschland) GmbH ("Interunity") is a company

having its registered office in Bremen, Germany. Since around 16 May 2020, when the

SMAs took effect, Interunity has at all material times been acting as agents for and on behalf

of Plaintiffs.  Before that, the appointed agent of the Plaintiffs was Pausco Agencies (UK)

Limited ("Pausco").

10.     Each of the SMAs are in materially identical form with the following material

terms:

[Part I]

"2. Date of commencement of Agreement … Upon takeover of vessel.

1.      Technical Management … Yes.

2.      Crew Management … No.

3.      Commercial Management … No.

14. Annual management fee … USD 125,195.00.

18. Minimum contract period … 12 months"

[Part II]

"3. Authority of the Managers

3.1 Subject to the terms and conditions herein provided, during the period of this
Agreement the Managers shall carry out the Management Services in respect of the
Vessel as agents for and on behalf of the Owners [Plaintiffs]. The Managers shall
have authority to take such actions as they may from time to time in their absolute
discretion consider to be necessary to enable them to perform the Management
Services in accordance with sound ship management practice, including but not
limited to compliance with all relevant rules and regulations.

4. Technical Management

The Managers shall provide technical management which includes, but is not limited
to, the following services:

(a) ensuring that the Vessel complies with the requirements of the law of the Flag
State; […]

(d) providing competent personnel to supervise the maintenance and general
efficiency of the Vessel;

(e) arranging and supervising dry dockings, repairs, alterations and the maintenance
of the Vessel to the standards agreed with the Owners [Plaintiffs] provided that the
Managers shall be entitled to incur the necessary expenditure to ensure that the Vessel
will comply with all requirements and recommendations of the classification society,
and with the law of the Flag State and of the places where the Vessel is required to
trade;

(f) arranging the supply of necessary stores, spares and lubricating oil; […]

8. Managers' Obligations

(a) The Managers undertake to use their best endeavours to provide the Management Services as agents for and on behalf of the Owners [Plaintiffs] in accordance with sound ship management practice and to protect and promote the interests of the Owners [Plaintiffs] in all matters relating to the provision of services hereunder. […]

17. Responsibilities

(b) *Liability to Owners* [Plaintiffs]

(i) Without prejudice to Sub-clause 17(a), the Managers shall be under no liability whatsoever to the Owners [Plaintiffs] for any loss, damage, delay or expense of whatsoever nature, whether direct or indirect (including but not limited to loss of profit arising out of or in connection with detention of or delay to the Vessel) and howsoever arising in the course of performance of the Management Services UNLESS same is proved to have resulted solely from the negligence, gross negligence or wilful default of the Managers or their employees or agents, or sub-contractors employed by them in connection with the Vessel, in which case (save where loss, damage, delay or expense has resulted from the Managers' personal act or omission committed with the intent to cause same or recklessly and with knowledge that such loss, damage, delay or expense would probably result) the Managers' liability for each incident or series of incidents giving rise to a claim or claims shall never exceed a total of ten (10) times the annual management fee payable hereunder. […]

20. Compliance with Laws and Regulations

(a) The parties will not do or permit anything to be done which might cause any breach or infringement of the laws and regulations of the Flag State, the places where the Vessel trades and of the parties domicile, provided always that the Managers' obligations under this clause will only relate to matters which the Managers are in fact capable of fulfilling and on the understanding that the Managers receive all necessary cooperation, information and funding from the Owners [Plaintiffs].

21. Duration of the Agreement

(a) This Agreement shall come into effect at the date stated in Box 2 and shall continue until terminated by either party by giving notice to the other; in which event this Agreement shall terminate upon the expiration of the later of the number of months stated in Box 18 or a period of two (2) months from the date on which such notice is received, unless terminated earlier in accordance with Clause 22 (Termination). […]

22. Termination

(a) *Owners'* [Plaintiffs'] *or Managers' default*

If either party fails to meet their obligations under this Agreement, the other party may give notice to the party in default requiring them to remedy it. In the event that the party in default fails to remedy it within a reasonable time to the reasonable satisfaction of the other party, that party shall be entitled to terminate this Agreement with immediate effect by giving notice to the party in default.

(f) This Agreement shall terminate forthwith in the event of an order being made or resolution passed for the winding up, dissolution, liquidation or bankruptcy of either party (otherwise than for the purpose of reconstruction or amalgamation) or if a receiver or administrator is appointed, or if it suspends payment, ceases to carry on business or makes any special arrangement or composition with its creditors.

(j) The termination of this Agreement shall be without prejudice to all rights accrued due between the parties prior to the date of termination.

23. BIMCO Dispute Resolution Clause

(a) (ii) Court Option

Notwithstanding the Arbitration sub-clause 23(a)(i) above, either party shall have the option of referring any dispute to the High Court of Justice, England (the "Court").

Such option must be declared when a party wishes to commence proceedings (for the claiming party) or within 14 days of receipt of an Arbitration Notice (for the respondent) and, upon such declaration the parties shall procure that the arbitration (if commenced) be discontinued (without an arbitral award being given).

Upon the declaration of a Court Option by either Party, both Parties shall immediately and irrevocably appoint competent solicitors in England as process agents for the purpose of service of documents, and advise the other Party in writing of their identity and contact details within 3 working days of their appointment.

The Parties waive any objection now or later to any proceedings being brought in the Court and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Court."

11.     Further or alternatively, as ship manager and agent of the Plaintiffs, CSM was also a fiduciary required to act at all times in the best interests of the Plaintiffs. Its fiduciary obligations to the Plaintiffs included, inter alia, a duty to act in good faith, not to place itself in a position where its duties and interests conflicted, and not to act for its own benefit, or the benefit of a third party, in relation to the affairs of the Plaintiffs or the Vessels.

## **CSM's Breach of the SMAs and/or Duties as Fiduciary**

12.     From late April 2020, CSM committed a series of repudiatory and/or renunciatory breaches of the SMAs, and/or breaches of its fiduciary duties, by purporting continually to treat the contracts as at an end, wrongly informing creditors and the LMA that Plaintiffs were insolvent and the SMAs had been terminated by CSM, and in all the circumstances failing thereafter to carry out the services required of it thereunder.

13.     With respect to the Vessels ANDES and ANDINO, such repudiatory breaches continued until around 16 May 2020 when the Plaintiffs accepted CSM's repudiatory breach and brought the contracts for those vessels to an end.  With respect to the remaining Vessels, the ALGARROBO, ARICA and AUSTRAL, such repudiatory breaches continued until around 26 May 2020, when the Plaintiffs accepted CSM's repudiatory breach and brought the contracts for those vessels to an end.

14.     By virtue of one or more of these breaches of contractual and/or fiduciary duties, the LMA issued notices detaining three of the five Vessels and preventing them from performing their respective charterparties.  All five Vessels were subsequently arrested.

15.     For the avoidance of any doubt, such breaches were acts of willful default and/or gross negligence and/or negligence for the purposes of clause 17(b)(i) of the SMAs, committed with the intention of, knowledge of and/or recklessly with a view to causing the loss and damage suffered.

### Wrongful Purported Termination of the SMAs by CSM

16.     On 28 April 2020 (20:04 hrs), CSM wrote to BAML to assert that the Plaintiffs had declared themselves to be insolvent. CSM stated that it accordingly considered the SMAs to be "frustrated and/or extraordinarily terminated."  CSM's assertion was false. None of the Plaintiffs had declared themselves to be insolvent.  Moreover, CSM as Plaintiffs' ship manager and agent knew when writing to BAML that the ALGARROBO and ARICA were subject to profitable charters, and that the AUSTRAL was the subject of negotiations for entry into a subsequent charter contract.

17.     On 29 April 2020, CSM wrote to NLB and notified it that the SMAs had been terminated pursuant to clause 22(f):

> "we inform you as Security Trustee and Agent that pursuant to each Shipmanagement Agreement, Clause 22(f), each of such Agreement [sic] has been terminated forthwith as the Plaintiffs have suspended payments, Plaintiffs' bank accounts have been blocked and the Plaintiffs have advised that they have ceased to carry on business and will file for insolvency. We have confirmed the Plaintiffs the receipt [sic] of such information and that in accordance with the Clause stated above, the Shipmanagement

Agreements have been terminated. In any case, the Agreements are legally frustrated because of the Plaintiffs' situation in addition to such termination. […]"

18.     This purported termination did not bring the SMAs to an end as clause 22(f) thereof was not satisfied. No relevant order or resolution for a winding up, dissolution, liquidation or bankruptcy of the Plaintiffs had been passed, no receiver or administrator had been appointed in respect of the Plaintiffs, and the Plaintiffs had not suspended payment, ceased to carry on business or made any special arrangements or composition with its creditors.  By purporting to terminate the SMAs on this wrongful basis, CSM committed a repudiatory and/or renunciatory breach of those contracts.

19.     Thereafter, CSM repeatedly and wrongly asserted (including to third parties) that the SMAs had been terminated or were at an end, in breach and/or continuing repudiatory and/or renunciatory breach of the SMAs and/or in breach of fiduciary duty.  For example:

a.     On 30 April 2020 (14:18), CSM wrote to NLB to assert that the SMAs had been terminated.

b.     On 30 April 2020 (15:52), CSM wrote 5 separate emails to the LMA in respect of each Vessel to say that Plaintiffs "have declared that they are insolvent and that they are intending to immediately initiate insolvency proceedings."In those emails, CSM also wrote that "[b]ecause of this, we regret to herewith inform you that the shipmanagement agreement for the [vessel] was terminated and we are currently preparing to discontinue the management of the vessel immediately."  The LMA acknowledged these emails the same day.

c.     On 30 April 2020 (16:21), CSM wrote to BAML to assert the SMAs had been terminated, but CSM was "open to re-instate the management agreements."

d.     On 30 April 2020 (16:56), CSM wrote again to BAML to assert the SMAs had been terminated, citing "abandonment" by Plaintiffs.

      e.     On 3 May 2020 (20:43), CSM wrote to Pausco to assert the SMAs were "accordingly terminated with immediate effect."

      f.     On 7 May 2020 (11:07), CSM wrote to NLB in order to indicate its willingness to "treat the management agreements on all five vessels as reinstated."

      g.     On 7 May 2020 (12:55), CSM wrote to Mr. Christos Mangos of Interunity in terms that referred to CSM having terminated the SMAs.

      h.     On 7 May 2020 (17:00), CSM wrote to Ince & Co Solicitors (acting for NLB) and referred to being willing to "re-instate the terminated management agreements".

      i.     On 15 May 2020 (15:34), CSM wrote to Mr. Mangos of Interunity in terms that treated the SMAs as at an end such that CSM had no obligation to comply with instructions duly given by the Plaintiffs concerning the Vessels.

## Termination of the SMAs

20.     As a consequence of the matters referred to at paragraphs 15 to 19 above, on 16 May 2020 (18:05) the Plaintiffs (via Interunity) accepted CSM's repudiatory and/or renunciatory breaches of contract so as to bring the SMAs with respect to the ANDES and ANDINO to an end:

> CSM have today been giving operational instructions to the Vessels' crew with regard to the passage of the Vessels and taken other action consistent with being manager. Your position as manager is therefore confused, because you have also refused to perform many elements of the management services. In the circumstances, to the extent it is necessary for them to do so, the [plaintiffs] accept the manager's words and conduct as a repudiation of the Management Agreement, so terminating it without prejudice to the [plaintiffs'] rights to claim damages.

21.     Despite that lawful acceptance of CSM's repudiatory breach, CSM continued after 16 May 2020 to assert wrongfully that it had already terminated the SMAs.  Plaintiffs accordingly seek a declaration that CSM committed one or more repudiatory breaches of contract accepted by Plaintiffs on 16 May 2020, so as to bring the SMAs to an end.

22.     As a further consequence of the matters referred to at paragraphs 15 to 19 above and/or CSM's continued assertions after 16 May 2020 that it had already terminated the SMAs, Plaintiffs accepted CSM's repudiatory and/or renunciatory breaches of contract with respect to the SMAs for the ALGARROBO, ARICA and AUSTRAL on 26 May 2020, and Plaintiffs seek a declaration in the London Litigation accordingly.  In this regard, Plaintiffs shall rely inter alia on the following correspondence:

a.     On 16 May 2020 (21:47), CSM wrote to Interunity (et al) to say "[w]e have always said (and maintain) that the technical management agreements were terminated".

b.     On 19 May 2020 (09:59), CSM wrote to the Master of the AUSTRAL (et al) to say inter alia that "our involvement as technical manager of your vessel or otherwise is at an end".

c.     On 19 May 2020 (16:17), CSM wrote to Interunity to say: "I think we have made ourselves very clear from day one. The management contracts were terminated on 28th April. Please proceed accordingly …".

d.     On 21 May 2020 (15:51), CSM wrote to the Master of the AUSTRAL (copying Interunity et al) to say "[w]e have no involvement with this vessel anymore where [CSM] has terminated the technical management contract. Interunity have informed us that Plaintiffs are no longer solvent …".

e.     On 25 May 2020 (17:42), CSM wrote to Interunity (et al) concerning the ARICA, ALGARROBO and AUSTRAL and said, inter alia: "On 28th April 2020 [CSM] terminated the management agreements over the above Vessels and in addition over the Andes and Andino…".

f.     On 26 May 2020 (19:07), Interunity wrote to CSM (et al) to say that CSM's repudiatory breach of contract was accepted and Plaintiffs were exercising the contractual option in clause 23(a) to have the disputes between the parties determined before the English High Court.

### Further Breaches of the SMAs and/or Fiduciary Duty

23.     Further, throughout the period referred to in paragraphs 15 to 19 above, CSM also failed in breach of the SMAs and/or in breach of fiduciary duty to comply with orders and instructions given to it by the Plaintiffs, and/or gave its own instructions and orders to the Vessels that were at odds with the Plaintiffs' wishes and/or at odds with the best interests of the Vessels and/or Plaintiffs.

24.     On or around 29 April 2020, CSM wrote to an undisclosed list of creditors of the Plaintiffs to say: "[Plaintiffs] consider themselves insolvent and shall immediately file for insolvency.  [Plaintiffs] requested that we inform Creditors accordingly. Unfortunately, Creditors must now consider their own positions and refer their claims to Pausco as [Plaintiffs'] agents and seek to recover from [Plaintiffs] … in the insolvency proceedings or against the vessels.  [CSM] is also a substantial creditor and will also be presenting a claim. All information on the vessels' positions and movements can be obtained from Messrs. Pausco with following contact details …" (herein referred to as the "Broadcast").  Each of the allegations was false.  Plaintiffs did not consider themselves insolvent.  Plaintiffs had no intention to file for insolvency, immediately or otherwise.  Plaintiffs had not requested that CSM write to Plaintiffs' creditors with this false information.

25.     By making that Broadcast, whose premise was false, CSM committed a breach of clause 8(a) of the SMAs, and/or breached its fiduciary duty to act in Plaintiffs' best interests, as it was manifestly contrary to Plaintiffs' interests for creditors to wrongly believe Plaintiffs were insolvent and to be encouraged to bring claims against Plaintiffs, including claims to arrest the Vessels.

26.     After the Broadcast, CSM also wrote to the LMA on 30 April 2020 in similar terms: see paragraph 15.2 above (the "LMA Email").  The LMA Email amounted to a breach of clause 4(a) and/or clause 8(a) of the SMAs, and/or a breach of fiduciary duty, because it was manifestly contrary to Plaintiffs' interests for the LMA to falsely believe that Plaintiffs

were insolvent, or that the SMAs had come to an end and the Vessels were without managers, and/or because the LMA Email led to the LMA detaining three of Plaintiffs' Vessels.

27.     As a consequence of CSM's wrongful termination and/or the Broadcast and/or the LMA Email and/or because CSM failed to pay the crew of Plaintiffs' Vessels:

       a.     On 4 May 2020, the LMA issued a notice of detention for the ARICA.

       b.     On 26 May 2020, the LMA issued notices of detention for the ALGARROBO and AUSTRAL.

       c.     On 1 June 2020, the United States Coast Guard issued a notice of detention for the ARICA.

28.     These notices of detention meant that the ALGARROBO, ARICA and AUSTRAL could not sail and were prevented from trading. They could neither satisfy orders issued under their extant charterparties nor enter into or satisfy new charterparties.

29.     With respect to the ALGARROBO in particular:

       a.     On or around 14 April 2020, the ALGARROBO was fixed for a charterparty by Transfrut Express Limited ("Transfrut") at a rate of US$11,850 per day for a period of between 29 and 35 weeks.

       b.     Pursuant to that charterparty, the ALGARROBO was to be delivered into service in Columbia on or around 15 May 2020, ready to commence loading on 16 May 2020.

       c.     In breach of clause 8(a) of the SMA for that vessel, and/or in breach of fiduciary duty, CSM failed to instruct the ALGARROBO to proceed from Costa Rica to Columbia to be delivered into service on or around 15 May 2020. Instead, CSM kept the vessel in Costa Rica and the Transfrut charterparty was lost on or around 9 May 2020.

       d.     The loss of the charterparty caused FS ALGARROBO to incur a loss of US$692,677.50 in charter hire. On 4 June 2020, Transfrut also brought a claim against FS ALGARROBO seeking compensation for non-compliance with the charterparty in the sum of

US$1,500,000. FS ALGARROBO seeks damages and/or an indemnity from CSM with respect to any sum found due to Transfrut with respect to that claim.

e.      In further breach of clause 8(a) of the SMA, and/or fiduciary duty, CSM failed to instruct the ALGARROBO to shift from inner anchorage at Costa Rica to outer port limits, so as to protect her against the risk of arrest flowing from either the Broadcast and/or the LMA Email and/or the notice of detention referred to at paragraph 23.2 above, which prevented the Vessel from trading. As a consequence of that failure, and/or as a consequence of the Broadcast and/or LMA Email, and/or as a consequence of the breach at paragraph 24.3 above, the ALGARROBO was arrested in Costa Rica on 16 May 2020 by Gulf Oil Marine. FS ALGARROBO subsequently incurred no less than US$90,098.84 to secure the release of the ALGARROBO.

30.     With respect to the ARICA in particular:

a.      On or around 13 March 2020, the ARICA substituted the ALGARROBO as the performing vessel under a charterparty with Network Shipping Ltd (Delmonte) ("Delmonte"), originally entered into on or around 7 October 2019 (the "Delmonte CP").

b.      As a consequence of the LMA Email and/or notice of detention referred to above, the ARICA was placed off-hire under the Delmonte CP from 18:42 hrs on 5 May 2020 and was unable to earn hire thereunder at a daily rate of US$12,000.

c.      In further breach of clause 8(a) of the SMA, and/or fiduciary duty, CSM failed to instruct the ARICA to depart from United States territorial waters to protect her against the risk of arrest flowing from either the Broadcast and/or the LMA Email and/or the notice of detention referred to above.

d.      As a consequence of that failure, and/or the Broadcast, LMA Email and/or notice of detention referred to above more generally, the ARICA was the subject of arrests by a number of parties (including Delmonte, Atlas Gemi Vanalari ve Eipmanlari Tic

Ltd Sti, Atlas Uluslararasi Kumanyacilik tic AS, and Deutsche Calpam GmbH) between 19 and 26 May 2020 while she was off Gloucester, Philadelphia. The ARICA was sold at the United States Marshal's auction.

       e.     The ARICA has also been and is off-hire, with the charterers eventually terminating the charterparty due to the off-hire, and/or unable to trade during her arrest and FS ARICA accordingly seeks damages and/or an indemnity in respect of any and all loss and damage suffered and which may be suffered in the future as a consequence of the LMA's notice of detention and arrests referred to above.

      31.     With respect to the AUSTRAL in particular:

       a.     In breach of clause 8(a) of the SMA, and/or fiduciary duty, CSM: (1) failed to instruct the AUSTRAL to depart from Spanish territorial waters to protect her against the risk of arrest flowing from either the Broadcast and/or the LMA Email and/or the notice of detention referred to at paragraph 23.2 above; and/or (2) ordered the AUSTRAL to shift to inner anchorage at Huelva, knowing it would expose her to arrest.

       b.     As a consequence of that failure, and/or the Broadcast, LMA Email and/or notice of detention referred to at paragraph 23.2 above more generally, the AUSTRAL was the subject of arrests by a number of parties on around 12 to 19 May 2020 while she was off Huelva, Spain. She remains under arrest to date and FS AUSTRAL continues to incur operating expenses with respect to the vessel. FS AUSTRAL claims from CSM damages and/or an indemnity in respect of any and all costs occasioned to it by the arrests of the vessel, including but not limited to operating expenses during the period of arrest.

       c.     The AUSTRAL has been unable to trade during her arrest and FS AUSTRAL accordingly seeks damages and/or reimbursement in respect of any and all loss and damage suffered as a consequence of the LMA's notice of detention referred to above and/or the arrests referred above.

d. Further, in around late April 2020 (and after CSM had wrongly alleged Plaintiffs were insolvent) negotiations were underway to hire the AUSTRAL to a charterer at a hire rate of US$7,500 per day. The arrests of the AUSTRAL prevented that charterparty from being agreed, and Plaintiffs accordingly seek damages at a rate of US$7,500 per day for every day of the arrests, or alternatively in such a sum as to reflect the lost income during the period of the arrests.

32. With respect to the ANDINO in particular:

a. On 30 April 2020, and while the ANDINO was lying off Rotterdam, NLB (in its capacity as Security Agent under the Loan Agreement) wrote to CSM and requested that CSM comply with instructions to relocate the ANDINO to Malta. That instruction was given with the knowledge and/or approval of, or on behalf of, Plaintiffs, and Plaintiffs in any event affirmed that instruction expressly or impliedly on or around 16 or 17 May 2020.

b. On 30 April 2020, and in breach of clause 8(a) of the SMA and/or in breach of fiduciary duty, CSM wrote to BAML and refused to move the ANDINO.

c. On 16 May 2020, and while the ANDINO was on her way to Malta, CSM wrote to Interunity to say the crew reported to CSM and CSM would not comply with the request to order the ANDINO to Malta, and "we have no choice but to instruct the vessels to stop and return to their embarkation ports."This constituted a further breach of clause 8(a) of the SMA and/or breach of fiduciary duty.

d. The same day, Interunity wrote to CSM: "I must again ask that you refrain from attempting to interfere with the lawful path of the mv "Andes" and mv "Andino" to Malta".

e. Thereafter, Interunity communicated with the Master of the ANDINO directly and the vessel recommenced her voyage to Malta.

   f. CSM's breach of contract and/or fiduciary duty in interfering with the passage of the ANDINO caused Plaintiffs loss: (1) operating expenses were incurred during periods of CSM's interference; and (2) throughout the period between 30 April 2020 and around 16/17 May 2020, Plaintiffs were unable to hire the ANDINO due to CSM's interference.  Plaintiffs accordingly claim loss of income for the ANDINO during this period at a daily rate of around US$7,500 (being the market rate achievable for the similar vessel, AUSTRAL, at around the same time) or at such a rate as the Court deems appropriate.

  33. With respect to the ANDES in particular:

   a. Paragraph 28 above is repeated mutatis mutandis it applies equally to the ANDES, which was lying off the coast of Greece before CSM interfered with her passage to Malta.

   b. After her arrival at Malta, and on or around late May 2020 and/or early June 2020, the ANDES was arrested as a consequence of the Broadcast, and/or the LMA Email, by one or more creditors who became aware of the same, or otherwise believed that Plaintiffs had gone insolvent. During the period of her arrest, the ANDES was unable to trade and FS ANDES claims damages reflecting that loss of trade.  FS ANDES also claims damages to reflect the operating expenses it incurred during the period of arrest.

### Breach of Technical Management Obligations

  34. Since the termination of the SMAs:

   a. The AUSTRAL underwent a condition survey by SUL Marine Consultants & Technical Services ("SUL") on 11 June 2020. SUL produced a Condition Survey Report on 26 June 2020 (the "AUSTRAL Report");

   b. The ANDINO underwent a condition survey by O.F. Gollcher & Sons Ltd ("OFG") on 1 July 2020. OFG produced a Condition Survey Report on 6 July 2020 (the "ANDINO Report"); and

      c.      The ANDES underwent a condition survey by OFG on 1 July 2020. OFG produced a Condition Survey Report on 11 July 2020 (the "ANDES Report").

35.      The AUSTRAL Report, ANDINO Report and ANDES Report (collectively, the "Reports") reveal that, while CSM was the technical manager of those vessels, CSM failed to satisfy its technical management obligations in breach of clauses 4 and/or 8 and/or 20(a) of the SMAs for the relevant vessels, and/or in breach of fiduciary duty.

36.      With respect to the AUSTRAL, the AUSTRAL Report reveals that CSM negligently and/or willfully failed to ensure the vessel complied with the requirements of the law of the Flag State (clause 4(a)) and/or failed to provide competent personnel to supervise the maintenance and general efficiency of the vessel (clause 4(d)) and/or failed to maintain and/or repair the vessel (clause 4(e)) and/or failed to supply necessary stores or spares (clause 4(f)). In particular and without prejudice to the factual and/or expert evidence that Plaintiffs shall rely on in due course:

37.      Contrary to the requirements of Class:

      a.      The auxiliary engine no. 4 had been out of service since at least 2019;

      b.      The ventilation vent head louvres for the vessel's cargo holds were not fit for service and required replacement;

      c.      The C/H no. 6 starboard fan electric motor was damaged and required replacement;

      d.      The forward wire of crane no. 3, which was changed in February 2020, required servicing in order to adjust the hoisting wire limit switch;

      e.      The oil cooler of cargo crane no. 2 lacked requisite connecting hoses and valves and its hoisting gear oil temperature sensor was out of order;

      f.      Cracks were discovered on the starboard and port sides of the passage way void space;

      g.      The proximity switches for steering pump no. 1 required replacement;

h.      The E/R vent fan no. 3 was found damaged;

i.      The ballast pump outlet pipe suffered from a leak and required repair;

CSM conducted temporary repairs installing a Cement Box in contravention of Class Rules.

This is a dangerous practice, a defect of which could cause damages only repairable in dry

dock, requiring divers to plug the pipe and carry out the permanent repairs while afloat.

j.      The Main Engine's Variable Injection Timing function was found to be

out of order;

k.      Several tubes of the boiler were found to be leaking;

l.      The safety valve for air bottle no. 2 required repair;

m.      The Auxiliary Engine's LO purifier no. 1 heater was clogged and

required repair;

n.      The working air compressor press switch was found to be broken;

o.      Certain pipes on board had been temporarily repaired with the use of

clamps and required permanent repairs;

p.      Auxiliary Engine no. 4 was found to be out of order;

q.      Auxiliary Engine no. 3 inlet CW valve for the intercooler was found to

leak when the vessel's engine was stopped;

r.      The ESB circuit breaker micro logic unit was found to be broken and

disconnected; and

s.      The MTU power pack was out of order.

38.      Contrary to statutory flag requirements:

a.      The bridge alarm system panel was found to be defective and alarmed

periodically;

b.      The wind indicator displays were found damaged;

c.      The line thrower rocket had been allowed to expire in April 2020;

      d.     The medical oxygen resuscitator and cylinder had not had its annual service; and

      e.     The BA Compressor (LW 100E) had not been serviced by 17 September 2019, as required.

39.    As a consequence of poor maintenance:

      a.     The port and starboard aft and forward draft marks were found to be in a very poor condition;

      b.     Certain of the manual valves on the ballast lines could not be operated due to blockages;

      c.     The booster units and viscometer for the Main Engine and Auxiliary Engine were found to be out of order;

      d.     The vessel's Main Engine and Auxiliary Engine required an overhaul;

      e.     The vessel's FO pumps required replacement; and

      f.     A special tool for the charging of the ME alpha lubricator accumulators was found to be broken.

40.    The total cost of replacing and/or repairing these items and defects with the AUSTRAL is presently estimated to be around US$800,729.50.

41.    FS AUSTRAL accordingly claims damages and/or an indemnity with respect to the cost of replacing and/or repairing the above items and defects, and any further defects that are found during the course of repair and/or replacement work to have been caused by a breach of CSM's duties as technical manager.

42.    With respect to the ANDINO, the ANDINO Report reveals that CSM negligently and/or willfully failed to ensure the vessel complied with the requirements of the law of the Flag State (clause 4(a)) and/or failed to provide competent personnel to supervise the maintenance and general efficiency of the vessel (clause 4(d)) and/or failed to maintain and/or repair the vessel (clause 4(e)) and/or failed to supply necessary stores or spares (clause

4(f)). In particular and without prejudice to the factual and/or expert evidence that Plaintiffs shall rely on in due course:

43.     Contrary to SOLAS requirements:

a.     The back-up batteries for the localised water mist system and the Fire Control System were low and required urgent replacements;

b.     The priming units for the main fire pumps were not functioning;

c.     The priming unit for the emergency fire pump was not functioning;

d.     The hydraulic oil tank for the vessel's lifeboat was found to be damaged;

e.     The delivery non-return valve for the emergency air compressor was found to be missing; and

f.     The diaphragm pump for the hazardous cargo hold drainage pump was found to be unserviceable.

44.     Contrary to MLC requirements:

a.     The compressor for the galley air conditioning unit was found to be unserviceable;

b.     Couplings were required for the provision room compressors;

c.     A new sensor was required for the fresh water steriliser monitoring unit, which was in a permanent alarm condition;

d.     The dishwasher on board was not serviceable; and

e.     The working gear washing machine was unserviceable.

45.     Contrary to the requirements of Class:

a.     Cracks were found in the common bed plate of auxiliary engines 1, 2 and 4;

b.     A crack was found in the entablature of auxiliary engine 3, in way of units 2 and 3;

      c.      After the renewal of the camshaft of auxiliary engine no. 2 in October 2019, the cylinder heads were taken ashore for reconditioning but had not been returned to the vessel, such that it was not operational;

      d.      The auxiliary engine oil coolers were found to be leaking, causing contamination of the low temperature water system;

      e.      The main engine piston units no. 2 and 3 were found to require an urgent overhaul, due to respective running hours since the last overhaul of 51,710 and 49,791 hours respectively, and new piston crowns were required for those overhauls which were unavailable on board;

      f.      The main engine shaft seal was found to be leaking when the engine was running, leading to a daily oil loss of about 50 litres;

      g.      The pumps of the main engine top bracing units were found to be defective, in that one pump seized and another failed to build up sufficient pressure;

      h.      n oil sight glass was broken on the main engine turning gear;

      i.      The viscometers and flow-meters for the main engine and auxiliary engines were found to not function;

      j.      The LO purifier for auxiliary engine no. 2 was defective, in that the feed pump housing was damaged and the purifier was out of service;

      k.      Extensive leaks were found in the drain lines and coolers of the main starting air compressors;

      l.      The working air compressor was out of service and a new liner was required;

      m.      As to the oil fired boiler, the oil content meter was damaged, the burner FO flow meter was damaged, the condenser tubes were blanked and leaking, and suitably dimensioned steel bottle brushes were required for the cleaning of new tubes;

n.      As to sea water cooling pump no. 2, suspected bearing damage was discovered, and the pump was out of service;

o.      Leaks were found from the steering gear flanges, connections and motors;

p.      As to the main engine LO cooler, an external oil leak was discovered;

q.      The purifier room exhaust fan was found to be unserviceable;

r.      The manual control lever of the forward starboard mooring winch was seized and could not be operated manually;

s.      The power cable reel for the monorail was found to be defective;

t.      An electrical fault was discovered with respect to the deck lighting, navigation lights and signal lamps;

u.      Several grids for the air ventilation trunkings in the hold were found to be missing;

v.      One five-plug reefer socket box was marked "out of order";

w.      The hold fan assemblies were out of order;

x.      The main cables feeding the reefer sockets in the cargo holds through the starboard side (longitudinal passage) were deteriorated and required renewal;

y.      The striker plate welded to the sounding pipe on the dirty water (bilge) tank had collapsed and the sounding lead was directly striking the shell plating, causing accelerated deterioration of the shell plate;

z.      The sounding arrangement for the sludge tank was defective;

aa.      Six pieces of the galley range switches were damaged; and

bb.      Two pieces of the galley range hot plates were found to suffer from low insulation.

cc.      As a consequence of poor maintenance and/or a failure to supply necessary stores or spares:

dd.     Rust was evident on the cross-deck platforms;

ee.     Two main engine cylinder units required replacement;

ff.     Crew maintenance could not be performed to the main deck and fore/aft mooring stations, due to a lack of paint and materials;

gg.     Several level indicators were not functioning and sixteen sensors (one for each fuel tank) were found to not work; and

hh.     Auxiliary engines no. 3 and 4 required an overhaul.

ii.     The total cost of replacing and/or repairing these items and defects with the ANDINO is presently estimated to be around US$1,344,511.13.

46.     FS ANDINO accordingly claims damages and/or an indemnity with respect to the cost of replacing and/or repairing the above items and defects, and any further defects that are found during the course of repair and/or replacement work to have been caused by a breach of CSM's duties as technical manager.

47.     With respect to the ANDES, the ANDES Report reveals that CSM negligently and/or willfully failed to ensure the vessel complied with the requirements of the law of the Flag State (clause 4(a)) and/or failed to maintain and/or repair the vessel (clause 4(e)) and/or failed to supply necessary stores or spares (clause 4(f)). In particular and without prejudice to the factual and/or expert evidence that Plaintiffs shall rely on in due course:

48.     Contrary to the requirements of Class:

a.     Cracks were detected in the boiler bottom tube plate and required repairs; and

b.     Fans in holds 1, 2 and 6 were found to be non-operational and required repairs.

c.     As a consequence of poor maintenance and/or a failure to supply necessary stores or spares, 150 pieces of flexible hoses need to be renewed in order to be made operational.

49.     The total cost of replacing and/or repairing these items and defects with the ANDES is presently estimated to be around US$214,023.75.  FS ANDES accordingly claims damages and/or an indemnity with respect to the cost of replacing and/or repairing the above items and defects, and any further defects found during the course of repair and/or replacement work to have been caused by a breach of CSM's duties as technical manager.

## Count I – Breach of Contract

50.     Plaintiffs repeat the foregoing paragraphs.

51.     CSM has breached its maritime contracts with Plaintiffs and caused Plaintiffs damages as demanded below.

## Prayer for Relief

WHEREFORE, Plaintiffs pray:

A.      That in response to Count I, process of maritime attachment be issued to garnish and attach property of CSM in the amount of at least $11,054,924.50 as detailed above and in **Appendix 1 hereto**, plus a further amount for accrued and accruing interest, costs and attorneys' fees of at least $500,000 in security of Plaintiffs' claims asserted in the London Litigation, upon that total amount of **$11,554,924.50** amount being garnished and attached, this action to be stayed and the amount to await final award in arbitration and judgment entered on such award by this Court;

B.      That in response to Count II, since CSM cannot be found within this District pursuant to Supplemental Rule B, this Court issue an Order directing the Clerk to issue Process of Maritime Attachment and Garnishment pursuant to Rule B attaching all of CSM's tangible or intangible property or any other funds held by any garnishee, up to the amount of at least the amount demanded herein to secure Plaintiffs' claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Supplemental Rule B, answer the matters alleged in the Verified Complaint;

C.      That as provided in Supplemental Rule B, that such person over 18 years of age be appointed as moved for herein pursuant to Supplemental Rule B and Fed. R. Civ. P. 4(c) to serve process of Maritime Attachment and Garnishment in this action;

D.      That this Court award Plaintiffs such other and further relief that this Court deems just and proper.

<div style="margin-left:40%">

YOUNG CONAWAY STARGATT
& TAYLOR LLP

</div>

**OF COUNSEL**

J. Stephen Simms
Simms Showers LLP
201 International Circle, Ste. 250
Baltimore, Maryland 21030
Telephone:     (410) 783-5795
Facsimile:     (410) 510-1789
jssimms@simmsshowers.com


Dated:  August 4, 2020

<div style="margin-left:40%">

*/s/ Timothy Jay Houseal*
Timothy Jay Houseal (Del. Bar ID No. 2880)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6682
thouseal@ycst.com

*Attorneys for FS Algarrobo Limited, FS Andes Limited, FS Andino Limited, FS Arica Limited, FS Austral Limited*

</div>